**UNITED STATES of America, Plaintiff,**

v.

**Peter F.K. BARABAN, Defendant.**

**Nos. 80–219–Cr, 82–2661–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

Dec. 4, 1984.

**1174**

Jane Moscowitz, Asst. U.S. Atty., Miami, Fla., for plaintiff.

R. Stan Mortenson, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO VACATE SENTENCE

SPELLMAN, District Judge.

On December 31, 1980, Peter F.K. Baraban was convicted, after a trial by jury, of three counts of evading federal income taxes in violation of 26 U.S.C. § 7201. This Court sentenced him to a total of six years imprisonment. On December 1, 1981, the Court of Appeals for the Eleventh Circuit affirmed the convictions, *per curiam*, without opinion. The United States Supreme Court declined review.

Baraban retained new counsel and filed the instant motion pursuant to 28 U.S.C. § 2255. Baraban now claims that his conviction is invalid and that he is entitled to a new trial on the grounds that (1) he was incompetent to stand trial at the time of his conviction; (2) he was deprived of effective assistance of counsel; and (3) the trial judge had an *ex parte* communication with a juror under circumstances in which the record fails to establish that such communication was not prejudicial.

This Court held extensive hearings on these claims and has reviewed the various expert reports and the comprehensive memoranda submitted by counsel. For the reasons detailed below, the Court finds that Baraban's motion to set aside his conviction must be DENIED. The opinion which follows constitutes this Court's findings of facts and conclusions of law.

## I. THE QUESTION OF COMPETENCY

■ The conviction of an accused while he is legally incompetent violates due process. *E.g., Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). The standard for whether a defendant is competent to stand trial is well-established. The relevant question is whether the defendant

> has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and whether he has a rational and factual understanding of the proceedings against him.

*Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

■ Although it is preferable to make a concurrent determination of an accused's mental status at the time of trial, an accused does not waive the issue of competency by failing to raise it at trial. *Pate,* 383 U.S. at 384, 86 S.Ct. at 841. When the issue of competency is raised for the first time in a habeas proceeding, as it is here, a petitioner is entitled to a hearing on the issue if he can come forward with "enough probative evidence to raise substantial doubt as to competence." *Bruce v. Estelle,* 536 F.2d 1051, 1058–59 (5th Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).[1] But once a hearing has been ordered, the petitioner "must then go further and prove the fact of incompetency, at least by a preponderance of the evidence". *Id.; accord Zapata v. Estelle,* 585 F.2d 750 (5th Cir.1978) (en banc).

At the hearing on this matter, Baraban was unable to meet this latter burden. At best, the evidence he presented demonstrated that he suffers from certain personality disorders, and that he was severely depressed during periods prior to his trial. This Court finds, however, that the greater

---

**1.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

weight of the evidence points to the fact that Baraban was competent under the relevant legal standards in that he understood the proceedings against him and was able to consult with his lawyer.

## A. Background

The testimony at the hearing established the following: Peter F.K. Baraban was a successful criminal defense lawyer practicing in Miami, Florida. As early as 1977 the IRS commenced a criminal investigation of the defendant. In 1979, a federal grand jury began investigating Baraban in connection with various narcotics and tax offenses. At about this same time, those persons closely associated with him saw a notable change in his behavior. He began failing to appear at the office, ignored outside contact, and repeatedly missed scheduled court appearances. By February 1980, Baraban had virtually abandoned his practice. His secretary was forced to enlist other lawyers to take over his cases.

By approximately May of 1980, Baraban's condition had so infected his relationship with his associates that they took steps to terminate their dealings with him and prompted him to seek psychiatric treatment. Baraban refused to seek help.

The indictment in this case was returned on June 12, 1980. Just five days later, on June 17, 1980, George Gold, a close friend and associate, was murdered in the hallway just outside Baraban's office door. The circumstances of the shooting led many people to speculate that Baraban was actually the gunman's target. Baraban was arraigned on three counts of tax evasion the day after the murder.

In addition to psychological difficulties, Baraban also experienced serious medical problems. During the summer of 1980, Baraban was hospitalized as a result of complications from kidney stones.

Baraban retained Hugh Culverhouse Jr. as his attorney shortly before he was indicted. Although Baraban met with Culverhouse and discussed the charges with him, by the early fall, his physical and emotional problems made him so completely unavailable that Culverhouse notified the Court of his difficulties communicating with his client. The Court indicated that if at any point Culverhouse felt that his client may be incompetent to stand trial it would order an inpatient psychiatric examination pursuant to 18 U.S.C. § 4244.

When Culverhouse told Baraban that he had discussed his difficulties in communicating with Baraban with the Court, Baraban's behavior changed markedly. According to Culverhouse, by the middle of November, Baraban became completely available for meetings about the case and actively sought witnesses who could aid in his defense. Culverhouse testified unequivocably that in the middle of December, when Baraban went to trial, he believed Baraban to be entirely competent.

## B. Evidence That Baraban Was Competent

There is considerable evidence that Baraban was capable of functioning adequately at the time of his trial. For example, just one month before his own trial Baraban ably defended a criminal defendant in federal court. In *United States v. Sutton*, No. 79–417–Cr–EBD, one of the issues raised pre-trial by Baraban was whether Sutton's long history of alcoholism rendered him incompetent to stand trial. Baraban filed motions and memoranda of law in which he discussed the competence issue in a sophisticated manner. Baraban's opposing counsel was Leah Simms, now a judge in the County Court, Dade County, Florida. Judge Simms testified that there was nothing unusual about Baraban's behavior in court. In fact, during jury selection on November 13, 1980, he demonstrated an extraordinary ability to memorize the names of the entire venire on one pass, which permitted him to question each potential juror, individually by name. The voir dire Baraban conducted, which this court ordered transcribed, shows that Baraban had a great deal of charm and a complete grasp of the issues involved. After the jury selection, Baraban negotiated a plea arrangement in which Sutton pled

guilty to one count of a three count indictment and received a sentence of probation.

As for preparing for Baraban's own trial, notwithstanding the period in which he was unavailable to Culverhouse, Baraban related the facts about his case and discussed strategy with Culverhouse. He told Culverhouse the source of his money, and when Culverhouse explained that the money would be taxable and thus not provide a defense, he changed his description of the source of the money to a loan which would not be taxable. Thus, he grasped the difference between a taxable and a non-taxable event. Furthermore, he confirmed the net worth expenditures which comprised the government's case.

By late November, 1980, Baraban was actively involved with counsel in searching for witnesses. He also hired Dr. Barry Crown, a psychologist often used by defense attorneys to help select the jury and to give advice on trial strategy. On the eve of trial, he participated in plea negotiations and discussed the matter with Culverhouse and solicited the opinions of other attorneys. He ultimately made the decision to go to trial because he believed that he would not get any larger sentence after a trial than the prosecutor would recommend to the Court after a plea.

At the trial, which began on December 16, 1980, Baraban conferred with Dr. Crown and his attorneys in picking the jury. He discussed the question of whether he should testify in his own behalf with Culverhouse on more than one occasion. He decided against testifying primarily because he believed that the jury would not find him sympathetic. He also considered however, that his testimony would subject him to cross-examination that the source of the money was narcotics. During the trial, Baraban took copious notes. He consulted with counsel when the government's exhibits were offered into evidence. And finally, at the time of sentencing, Baraban spoke eloquently on his own behalf.

■ In sum, it is undisputed that Baraban had serious emotional and physical difficulties at around the time he was indicted in this case. But notwithstanding these difficulties, Baraban provided his counsel with important facts about his case, actively sought defense witnesses, and hired a psychologist to help select the jury. At the time of trial he was capable of intelligently making such critical decisions as to whether he should proceed to trial or enter a plea and whether he should testify in his own behalf. During the trial, his demeanor was entirely appropriate and at the time of sentencing, he allocuted eloquently. These facts are uncontroverted and this Court finds that they clearly establish that Baraban was competent to stand trial. The Court's finding is further reinforced by the opinion of Baraban's defense counsel that at the time of trial Baraban was competent to stand trial. The fact that the defendant's attorney believes his client to be competent and able to assist in his defense is significant evidence that a defendant is competent. *See Reese v. Wainwright,* 600 F.2d 1085, 1092 (5th Cir. 1979) (placing significance on defense counsel's expressed belief that defendant was competent), *cert. denied,* 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979); *United States v. Clark,* 617 F.2d 180, 186 (9th Cir.1980) (placing significance on defense counsel's failure to move for competency hearing during trial).

The other evidence presented at the hearing is not sufficient to refute this evidence of competence.

### C. Evidence Relied Upon To Indicate Incompetence

In his argument that he was incompetent at the time of trial, Baraban places a great deal of weight on an episode at William Moran's house that occurred during the trial. According to Moran, an attorney who was a friend and associate of Baraban's, Baraban visited him one evening during the trial and was completely unable to intelligently discuss his case. Moran testified that he felt like he was "talking to a child."

■ This Court finds, however, that Baraban's inability to discuss his case with

Moran that evening could easily have been a result of Baraban's ingestion of alcohol or cocaine. Testimony at the hearing indicated that during this period Baraban was abusing both of these drugs. Certainly, the law does not envision a finding of incompetence whenever an anxious defendant drinks too much on an evening during his trial, and is, for that evening, too intoxicated to be competent.

█ Several witnesses who testified that they believed that Baraban was incompetent at the time of trial emphasized Baraban's apparent lack of concern about the case. But Baraban had previously exhibited this attitude, even during the time when he was functioning quite successfully. For example, another friend and associate of Baraban's, Phillip Weinstein, testified that he had represented Baraban early in the tax investigation but had great difficulty in communicating with him. Weinstein stated that he felt that he could not represent Baraban because Baraban was so uncooperative and because he refused to take a mature attitude toward preparing his defense. Weinstein's testimony establishes that Baraban sought to ignore his problems as early as 1977, during a period when his law practice was thriving and he was not perceived as incompetent by anyone. Indeed, Weinstein found Baraban to be erratic as early as 1973 when he first met him, "with regard to helping himself." The continuation of this attitude does not reflect incompetence to stand trial. Rather, this Court finds that it is more a reflection of Baraban's arrogance, immaturity and personality disorder.

### D. The Expert Testimony

The Court finds that the expert testimony also does not establish that Baraban was incompetent.

Dr. Barry Crown, the psychologist who Baraban had hired to help with the case, testified at length concerning his observations of Baraban during the trial. Although, Dr. Crown offered his opinion that Baraban was incompetent at the time of his own trial, he also testified that he observed Baraban during the *Sutton* case, discussed above, and it was his opinion that Baraban was incompetent at that time as well. Dr. Crown appeared in court on both cases and never called to the Court's or to anyone else's attention his view of Baraban's condition.[2] Thus even though this Court would normally give considerable weight to the opinion of a psychologist who actually observed a defendant functioning during his trial, the Court does not find Dr. Crown's views as to competency credible.

In addition to Dr. Crown, five other experts, three psychiatrists and two psychologists testified before this Court. All of the experts agreed upon the general nature of Baraban's mental disorder. Drs. Johnson and Hilkey, who examined Baraban during an inpatient competency examination at the Federal Bureau of Prisons,[3] diagnosed Baraban under the standards of the Diagnostic and Statistical Manual of Mental Disorders (DMS–III) (Axis-II) (long-term characteristics) as suffering from a Narcissistic Personality Disorder with Histrionic, Anti-Social and Compulsive features. Drs. Brain and Schwartzback, who were hired as defense experts, diagnosed Baraban's condition as a Borderline Personality Disorder with Narcissistic Features, which the DMS–III describes as frequently associated with Narcissistic Disorder. The mental impairment caused by the Borderline Disorder is essentially the same as for the narcissist, differing only in degree. Dr. Miller, hired by the government, did not provide a diagnosis of Baraban's condition in his report to the Court, but when provided with the DMS–III, stated that Baraban's

---

2. Although Dr. Crown testified that he took this matter up with Culverhouse during the trial, Culverhouse denies that this occurred. In view of Culverhouse's previous concern for his client, it appears incredible that Culverhouse knew this fact and did not call it to the Court's attention.

3. In connection with this motion, the Court ordered Baraban committed for a one month period, pursuant to 18 U.S.C. § 4244, for an inpatient psychiatric examination.

condition fell under the classification of Narcissistic Personality Disorder. None of the experts detected organic problems or memory loss.

Notwithstanding the experts' general agreement as to the nature of Baraban's mental disorder, there was little agreement as to whether this meant that Baraban was competent at the time of his trial. The doctors hired by the defense opined that although Baraban was now competent, at the time of his trial he was not. The expert hired by the government stated unequivocally that Baraban was competent at the time of his trial. The doctors who examined Baraban while he was committed to the Mental Health Division of the Federal Correctional Institution at Butner, North Carolina, found that Baraban was currently competent but that there was a *possibility* that he was incompetent at the time of trial.

■ The fact that a defendant apparently suffers from a mental disorder, does not necessarily mean that he is incompetent to stand trial. "The question remains as to whether this condition renders him so mentally ill that he is not possessed of the degree of rationality required by the law." *United States v. Adams*, 297 F.Supp. 596, 597 (S.D.N.Y.1969). Indeed, "even a finding of severe mental illness, sufficient to exculpate the defendant if found to exist at the time of the commission of the offense, would not necessarily render the defendant incompetent to stand trial." *United States v. Hearst*, 412 F.Supp. 858, 859 (N.D.Cal. 1975) (citations omitted), *aff'd on other grounds*, 563 F.2d 1331 (9th Cir.), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). Dr. Johnson pointed out, in her testimony, that ordinarily one would not expect that someone with a personality disorder such as Baraban's to be incompetent to stand trial. Moreover, it should be noted that all of the experts agreed that at the time of the hearing Baraban still suffered from a personality disorder but was competent—even though Baraban had received no therapy or other type of treatment between the time of his trial and the hearing on this motion.

■ Although experts can provide guidance to the Court in its determination of whether a defendant is competent to stand trial, the court "is not bound to agree with their conclusions if other probative evidence points to a different result." *United States v. Makris*, 535 F.2d 899, 905 (5th Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977). The very nature of the inquiry demands that a court not be bound by the views of the experts:

> Especially where the medical expert applies legal standards to arrive at a competency conclusion, he is performing a task at which only a judge is truly an expert. In the final analysis, the 'determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney and able to rationally and factually comprehend the proceedings against him.

*Id.* at 908.

■ The Court finds that the value of the expert opinions in this case to be minimal. Except for Dr. Crown, all of the experts were forced to rely upon information provided by Baraban, his friends, and associates. And this information, either consciously or unconsciously, may have been tailored to support a finding of incompetency. Dr. Johnson expressly noted the limitations on her study:

> The information provided to me from the various sources during this evaluation may be somewhat biased to support certain conclusions. I was not given the opportunity to directly talk to any of the information sources with the exception, of course, of Mr. Baraban and his mother. This prevented me from getting any additional clarification on the significance of some of the comments made in various affidavits and letters. It is also important to note that Mr. Baraban has been through a trial where the outcome

was not to his liking. His interest in a new trial and a different outcome obviously may consciously or unconsciously color his memory of his emotional and behavioral status during 1979 and 1980. Mr. Baraban does have the intellectual capabilities and legal experience to have planned to raise the issue of competency only if his original trial resulted in a guilty verdict and he did not accomplish anything on appeal.

Dr. Johnson further testified that there were two distinctly different versions of the facts relevant to her decision, one supporting competency and one not. Based on the facts supplied by Baraban, she concluded that there was a possibility of mental incompetence at the time of trial. Dr. Johnson testified, however, that if she were to find out that Baraban met with his attorney a "reasonable" number of times her opinion would change "markedly." Baraban's attorney testified that from the middle of November on, Baraban was available when needed. Dr. Johnson also stated that her opinion would be influenced if Baraban had participated in discussions regarding a potential plea and made the final decision himself. Again there was testimony by Baraban's attorney, that this is precisely what happened. Finally, she testified that her opinion would be influenced by learning that Baraban made arrangements ahead of trial for defense witnesses to come from Mexico. The witnesses from Mexico testified that Baraban had made the arrangements for them to appear at trial.

The other expert from Butner, Dr. Hilkey, testified similarly. If the government's version of the facts were true, he believed that Baraban may have been competent at the time of trial.

The Court also has not placed much weight on the expert opinions because of the overwhelming evidence pointing to the conclusion that Baraban was functioning adequately at the time of trial. The assessment made by the experts that Baraban's condition deteriorated at the time of trial simply is not supported by the observations made by this Court and Baraban's own

attorney. It is undisputed that in the summer and early fall of 1980, Baraban was unable to work with his attorney. But his condition and attitude improved markedly as the trial approached. His attorney, who had sufficient doubt about Baraban's competency in the fall of 1980 as to notify the Court of the possible problem, testified that by the time of trial he had no doubt in his mind that Baraban was competent. The Court finds this evidence more convincing than the opinions of experts who have based their opinions on self-serving statements and recollections.

## II. ASSISTANCE OF COUNSEL

The second argument Baraban advances in support of motion to vacate his sentence, is that he was deprived of effective assistance of counsel. Baraban's claims fall generally into three categories. First, Baraban argues that Culverhouse's failure to present the so-called "Mexican Loan" defense deprived him of a meaningful defense. Second, he claims that Culverhouse did not adequately investigate and present evidence creating doubt as to Baraban's likely source of income. And third, that Culverhouse fundamentally erred in failing to raise Baraban's incompetency to stand trial.

The Court finds that all of these contentions are completely without merit. As set forth more fully below, the evidence adduced at the hearing demonstrates, without question, that Baraban's counsel, Hugh Culverhouse Jr., provided more than constitutionally adequate assistance of counsel.

 The standard governing claims of ineffective assistance of counsel was recently set forth in *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on an ineffectiveness claim, a defendant must show not only that his counsel's performance was deficient but also that he suffered actual prejudice as a result. *Id.* 104 S.Ct. at 2064.

 In evaluating counsel's performance, a court must use an objective stan-

dard. There are no precise rules and no checklists to evaluate attorney performance. Moreover, in reviewing strategic choices, a court must be careful not to allow hindsight to distort its view. According to the Supreme Court:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it had proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 2065–2066 (citations omitted).

The presumption that "counsel's conduct falls within the wide range of reasonable professional assistance" is particularly appropriate here, for Culverhouse's background made him uniquely qualified to represent a defendant in a criminal tax case. In addition to his law degree, Culverhouse holds a Masters degree in Business Administration from New York University and is a Certified Public Accountant. Before entering private practice, he was an Assistant United States Attorney specializing in tax cases and had tried approximately thirty federal cases.

An analysis of Culverhouse's actual representation of Baraban, demonstrates that Baraban was rendered reasonably effective assistance. Culverhouse entered the Baraban case shortly prior to the indictment. He went to Mexico with other attorneys to get additional background on the case and to determine if there was any information that he could present to the Justice Department that may have headed off an indictment. He discussed the possibility of a pre-indictment plea with the Assistant United States Attorney in charge of the investigation.

After Baraban was indicted, Culverhouse brought Vincent O'Dea into the case as his investigator. O'Dea had been a Special Agent with the Internal Revenue Service for many years. O'Dea and Culverhouse received discovery and analyzed the government's evidence. The government was prepared to present evidence that during a three-year period Baraban's expenditures exceeded his reported income by some $2 million. O'Dea scheduled the financial information, seeking to make it parallel to what, in his experience, he expected the government to do. O'Dea and Culverhouse also began to interview Baraban and other witnesses. When Baraban confirmed the expenditures the government would prove to show the increase in the defendant's net worth, Culverhouse began to discuss potential dispositions of the case with the prosecutor.

As discussed above, Culverhouse had difficulty communicating with his client during the summer and early fall of 1980. He brought his concerns about Baraban's competency at that time to the Court's attention. He decided not to pursue the matter of competency when Baraban's behavior and attitude about the case changed and he cooperated with Culverhouse in preparing for trial.

Culverhouse and O'Dea planned a three-pronged defense: first, challenge the government's opening net worth; second, establish the existence of a $1.2 million loan to Baraban, thereby making a large part of Baraban's net worth increase un-

taxable; and third establish that certain clients had entrusted funds to Baraban, thereby creating another non-taxable source.

Culverhouse's effectiveness at trial was evident. He began the case with a significant challenge to the prosecutor's opening statement, which resulted in a strong curative instruction to the jury. Throughout the trial he objected to the admissibility of certain testimony and exhibits. In several instances, he successfully limited testimony and its impact by having witnesses voirdired outside the presence of the jury. In his cross-examination of the summary expert witness, Culverhouse effectively challenged the government's opening net worth figures. Through cross-examination of government witnesses, he attempted to establish the existence of non-taxable sources for the money Baraban spent. Culverhouse made several motions for a mistrial. Although the Court ultimately denied these motions, they presented serious questions and Culverhouse's objections and request for curative instructions minimized any prejudice to Baraban. Culverhouse further submitted jury instructions on behalf of his client. He made a forceful closing argument and he allocuted on Baraban's behalf at sentencing.

### A. The Mexican Loan Defense

Baraban's primary argument that Culverhouse was ineffective revolves around Culverhouse's refusal to investigate and present what has been characterized as the "Mexican Loan" defense. The substance of the defense is as follows: In 1974, Mario Mercado, a wealthy Mexican businessman, entered into an agreement whereby he loaned Baraban, a long-time friend, $2.5 million which Baraban was to invest in real estate in the United States. Mercado's objective was to expatriate a substantial portion of his estate to insulate it from imminent devaluation of the peso. Consistent with the requirements of the loan, Baraban invested the proceeds in a mansion overlooking the Atlantic in Palm Beach, Florida. Mercado and Baraban agreed to share

equally any profit from the sale of that property at the end of seven years. Mercado died from liver cancer in 1975.

At the evidentiary hearing on this matter, Culverhouse placed this "defense" in context, for it was not the only explanation Baraban had offered as the source of the considerable sums of money he had available to him. When Culverhouse first got into the case, Baraban told him that he had received the funds used in his massive expenditures from the sale of a gold mine in Mexico.[4] When Culverhouse informed Baraban that this would have been taxable, Baraban changed his story so that the funds were loaned to him with the mine as collateral. The loans eventually became funds entrusted for investment. At first, the sources of the funds were Mexican officials who could not testify because they could not account for how they obtained the money. Later, they were a different group of Mexicans, one of whom was a jeweler named Moshe Goldfarb. Finally, shortly before trial, Baraban came up with the Mercado defense, described above. Several days into the trial, he produced two witnesses who would testify, Rivas Rule, who was Mercado's son, and a Mr. Bandera, an attorney from Mexico.

■ Culverhouse had sound reasons for not using the Mercado defense and the witnesses in support of this defense that suddenly appeared. First, he had settled on a defense that he thought to be both truthful and effective—that Baraban was holding and using funds of clients who were in jail. Culverhouse believed that the jury would reject a change in tactics midstream. Second, the story itself was implausible. That Mercado gave Baraban a major part of his estate to invest as he chose for seven years without any security is in itself strange. But what made the story even more incredible was that the note was never recorded, was uncollectible, and most astounding, that Mercado's son had never asked for any accounting of his funds. And even if there truly had been an

---

**4.** Baraban had told a similar story to his former attorney, Phillip Weinstein.

agreement, Baraban had violated it, for it called for investment in real estate only, while Baraban's expenditures included art, automobiles, and jewelry. Thus, the government could have established conversion and taxability of the funds on rebuttal. And third, Culverhouse's associate, who interviewed these witnesses found them to be incredible. Culverhouse felt that because of its obvious falsity, the defense would not succeed, the Court would be offended and that Baraban could be sentenced more harshly. Finally, any doubts that Culverhouse may have had about not calling these witnesses were set to rest when the witnesses demanded that he pay them for their testimony, telling Culverhouse that Baraban had promised to pay them.

At the evidentiary hearing in this matter, the Court examined the witnesses for the Mexican defense at great length. It is the view of this Court that the witnesses were incredible; that the "Mexican Loan" defense was completely untenable; and that the defense could better be described as the "Mexican Hat Trick." Culverhouse's refusal to suborn perjury by presenting this defense should be commended and cannot be considered error.

## B. Failure To Challenge The Government's Likely Source Theory

The government proved at trial that the likely source of Baraban's funds were legal fees from his law practice. Baraban now says that this should have been challenged because the amount of money that Baraban had—$2.9 million over the course of three years—could not have been the result of his law practice.

■ But again, this Court finds that Culverhouse had sound reasons not to pursue this. A challenge to the likely source evidence introduced by the government, could easily have permitted the government to introduce substantial evidence that Baraban had obtained the funds in drug-sale "rip-offs" or had converted his clients' funds. In fact, Culverhouse had entered into an agreement with the prosecutor that he would not challenge the government's

theory of likely source if the government did not present evidence that Baraban was involved in the narcotics business. It was certainly reasonable for Culverhouse to want to prevent the jury from hearing such prejudicial evidence.

## C. Failure To Request A Competency Examination

■ Baraban also argues that Culverhouse should have pursued a the issue of Baraban's competence to stand trial. Of course, Culverhouse did raise the issue of Baraban's competence with the Court several months before trial. By the time of trial, however, Culverhouse found that Baraban was cooperative, and had no doubts about his competency. There was nothing unreasonable in failing to raise the issue again.

## D. Summary

In sum, this Court finds that Culverhouse's representation of Baraban was not in any way deficient. But even if the Court had found to the contrary, Baraban has not met the prejudice standard outlined in *Strickland v. Washington.* Unless a defendant can show that counsel's deficient performance prejudiced his defense, he is not entitled to relief.

■ To make a showing of prejudice it was not sufficient for a defendant to merely demonstrate that an error had "some conceivable effect on the outcome of the proceeding." 104 S.Ct. at 2067. If this were the test for finding a sixth amendment violation, any error of counsel would warrant a new trial. Similarly, a defendant cannot simply argue that counsel's errors "impaired the presentation of the defense." The Court found that this was unworkable and inadequate "because it provides no way of deciding what impairments are sufficiently serious to warrant setting aside the outcome of the proceeding." *Id.* at 2068. Instead, the Supreme Court held that the appropriate test for prejudice is whether there is "a reasonable probability that, but for counsel's unprofes-

sional errors, the result of the proceedings would have been different." *Id.* The Court defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* Thus, the relevant question in determining whether a defendant is entitled to a new trial because of ineffective assistance of counsel is "whether there is a reasonable probability that, absent the errors, the factfinder would have a reasonable doubt about guilt." *Id.* at 2069.

 In making this determination, a court must look at the totality of the circumstances. It must assume that the jury acted in accordance with the law, and in assessing the likelihood of a different outcome, it must exclude "the possibility of arbitrariness, whimsy, caprice, 'nullification', and the like." *Id.*

In the present case, Baraban clearly has not met his burden of demonstrating that any alleged errors on the part of his trial counsel had a reasonable probability of changing the outcome of the case. The government's evidence against Baraban was overwhelming. The Mercado loan defense was implausible. Even if such a defense had been raised, this Court finds that there was no reasonable probability that a reasonable jury would have entertained a reasonable doubt as to Baraban's guilt. Likewise, even if Culverhouse had challenged the government's evidence of the likely source of the funds and had requested a competency examination, there is little chance that the outcome of the trial would have been different. Whatever errors may have been committed by trial counsel, did not render the result here unreliable.

## III. EX PARTE COMMUNICATIONS

Baraban's final ground for reversal concerns an incident that occurred on the fifth day of trial. In conjunction with the testimony of IRS agent Alicia Ferrer, the government introduced schedules summarizing its net worth evidence against Baraban. These schedules were to be used as demonstrative evidence to assist the jury in

considering the asset and liability information summarized in the schedules. The Court recessed briefly during the cross-examination of Ms. Ferrer. During the recess, a juror approached the Court and inquired about the schedules. Immediately after the recess, and before the jury returned to the courtroom, the Court informed all parties as to what had occurred:

Gentlemen, let me point out something to you. As I was walking down the hall, one of the jurors came out and said that, in effect, what if I believe there is an error in the charts, and he was apparently referring to the year 1977, of something being added back in prior years, but not added in 1977. I am frank to say, I do not know what he is talking about.

I think all I can tell the jury, so as to clear his mind up, is that this has been prepared by the government for the sole purpose of assisting them, and if there is an error in the material matter, they should take that into consideration in utilizing the summary.

Thus the Court put the substance of the juror's inquiry on the record. It then proposed to counsel an instruction to the jury which clearly reveals that the Court had not previously responded to the juror. When the jury returned, the Court gave a general instruction to them as to how to treat the government's exhibits.

Trial counsel made no objection to the Court's handling of the incident. Moreover, Baraban's appellate attorney did not raise this issue on direct appeal. For the first time in this motion, Baraban claims that this encounter violated his right to be present at all proceedings in the trial.

 Because this issue is raised for the first time on collateral attack, in order to prevail, Baraban must show both adequate cause for his failure to object at trial and on direct appeal and actual prejudice resulting from the error. *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Baraban has shown neither. Although Baraban has prefaced

his motion with allegations of Culverhouse's ineffectiveness, he has not even articulated any cause for appellate counsel's failure to raise the issue on direct appeal. Moreover, there has been no demonstration of prejudice and under the circumstances here, no prejudice can be presumed. The Court immediately put on the record the substance of what had occurred. At the evidentiary hearing held on Baraban's motion to vacate, the Court further described the incident. It is apparent from the Court's description of the incident that the Court made no affirmative statement to the juror. The only communication from the Court to the jury occurred in open court after disclosure of the incident to the defendant and counsel. The Court's encounter with the juror was clearly harmless beyond a reasonable doubt.

## CONCLUSION

For the foregoing reasons, Baraban's Motion to Vacate Sentence is DENIED.