**UNITED STATES of America**

v.

**Santo V. RIGATUSO a/k/a Bob Harris.**

**Crim. No. JH–89–054.**

United States District Court,
D. Maryland.

July 18, 1989.

Gary Jordan, Esquire, First Asst. U.S. Atty., Breckinridge L. Willcox, U.S. Atty., Baltimore, Md., for U.S.

David B. Irwin of Irwin, Kerr, Green, McDonald & Dexter, Baltimore, Md., for defendant.

JOSEPH C. HOWARD, District Judge.

Defendant, Santo V. Rigatuso, was indicted by a grand jury in February of 1989 on twelve counts of mail fraud in violation of 18 U.S.C. § 1341. He was arraigned on February 24, 1989 and a plea of not guilty was entered on his behalf.

The matter is currently before the Court, pursuant to 18 U.S.C. § 4241, on the issue of defendant's mental competency. He has been psychiatrically evaluated pursuant to 18 U.S.C. §§ 4241 and 4247(b), (c). The government's psychiatrist, Dr. Neil Blum-berg, interviewed the defendant on June 6, 1989 for over two and one-half hours. His June 7, 1989 report and assessment have been, presumably, available to both parties. The defendant retained Dr. Michael Spodak, who interviewed defendant on April 20, 24, and May 12, 1989. His report is dated May 15, 1989. The Court assumes both parties have had access to that paper as well.

The due process guarantees of the Constitution proscribe the trial or guilty plea conviction of a person who is mentally incompetent. *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966); *Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); *Flugence v. Butler,* 848 F.2d 77, 79 (5th Cir.1988); *United States v. Percy,* 765 F.2d 1199, 1203 (4th Cir.1985); *Seventeenth Annual Review of Criminal Procedure: U.S. Supreme Court and Courts of Appeals 1986–1987,* 76 Geo.L.J. 526, 867 (1988). The federal standard for determining competency to stand trial prohibits trial if the court finds that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. Title 18 U.S.C. §§ 4241(d) and 4247(c)(4)(A). In *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court held that the trial judge must determine:

> Whether the defendant has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and whether he has a rational and factual understanding of the proceedings against him.

*Id.* at 402, 80 S.Ct. at 789.

The Fourth Circuit has applied this to guilty pleas as well. *Shaw v. Martin,* 733 F.2d 304, 314 (4th Cir.1984). In the federal system, the government bears the burden of proving the defendant's competency to stand trial. *See Seventeenth Annual Review of Criminal Procedure: U.S. Supreme Court and Courts of Appeals 1986–1987,* 76 Geo.L.J. 707, 871 n. 1704

(1988) (citing cases). And whatever this Court's determination on defendant's competency, it will not be overturned unless it is clearly arbitrary or unwarranted. *Ted Bundy v. Dugger*, 850 F.2d 1402, 1408 n. 5 (11th Cir.1988); *United States v. Caraza*, 843 F.2d 432, 437 (11th Cir.1988).

In *United States v. Taylor*, 437 F.2d 371 (4th Cir.1971), this district's Court of Appeals said:

Whether a person charged with a crime is mentally competent to stand trial is a *discrete* question, governed by different medical and legal standards from the question of mental responsibility.

*Id.* at 375. This Court must remember that the question of competency is a mixed question of law and fact which has direct constitutional implications. *United States v. Birdsell*, 775 F.2d 645, 648 (5th Cir.1985). Not inconsistent with *Birdsell*, the District Court for the Middle District of Florida in *Bundy* declared:

The question of competency calls for a basically subjective judgment. Unlike the determination of whether the death penalty is appropriate in a particular case, the competency determination depends substantially on expert analysis in a discipline fraught with subtleties and nuances. Consequently, it is this Court's job to weigh the evidence and determine questions of credibility. Faced with a record that supports conflicting inferences, this Court must consider the opinions of the psychiatric experts in light of all surrounding circumstances and determine which opinion is more realistic and credible given the evidence presented. Further, in considering competency, the Court may rely on, in addition to expert testimony, lay witnesses testimony concerning the Petitioner's rational behavior, and cross-examination of Petitioner's expert.

*Bundy v. Dugger*, 675 F.Supp. 622, 634 (M.D.Fla.1987), *aff'd*, 850 F.2d 1402 (11th Cir.1988).

The hearing of July 14, 1989, consisted of testimony from four witnesses. For the government, Dr. Neil Blumberg testified. For the defense, Mr. Francomano, Dr. Michael Spodak and the defendant, himself, testified.

Dr. Blumberg began his testimony at 10:10 a.m. and finished, including cross-examination, at 10:55 a.m. His forty-five minute testimony began with his credentials. He is "board certified" in psychiatry and forensic psychiatry which, as it was explained to the Court, is a sub-specialty of the profession linking law to psychiatry. When asked by the prosecutor how many competency evaluations he had done, he responded with "several thousands." He reviewed the materials set forth in his letter to Juliet Eurich dated June 7, 1989, which, as a result of this memorandum, shall become part of the Court file. In addition, through Dr. Blumberg, the government introduced Exhibits 1–3 of past Rigatuso transcript testimony which the Court has read since the hearing.

Obviously, Dr. Blumberg was on the stand to give his opinion. After being qualified, Dr. Blumberg gave the bases for his opinion, the statement of his opinion and the explanation of his opinion. To a reasonable degree of medical certainty or probability, Dr. Blumberg believes the defendant is competent to stand trial. Dr. Blumberg did not attempt to qualify his opinion in any way but he did, however, testify that the defendant suffers from several mental disorders. He resolved the tension between the two potentially competing statements by declaring that the disorders did not, and do not, reach the level necessary to find defendant incompetent.

According to Dr. Blumberg, defendant's disorders are three:

1) Obsessive Compulsive Disorder;

2) Narcissistic Personality Disorder with Histrionic Features; and

3) Tourette's Syndrome

The obsessive compulsive disorder is marked by "recurrent intrusive thoughts and persists for prolonged periods and interferes with social functionings." According to Dr. Blumberg, Rigatuso has had this "for many years."

With respect to his narcissistic disorder, its features include "very self-centered thoughts, sense of entitlement, no empathy and egocentricity." In essence, the holder of this disorder believes "the world revolves around him." To a layman, one would see the sufferer of this disorder as being "excessively dramatic, grandiose" and capable of "blowing things out of proportion."

Tourette's Syndrome is a neurological condition. It involves involuntary tics both physical—twitching and muscle contraction—and vocal.

Given these mental and physical impediments, Dr. Blumberg conceded Rigatuso suffers from "some degree of impairment" but that this does not infringe upon his ability to relate in an effective manner. Though Rigatuso rambles and "goes off on tangents," Dr. Blumberg states Rigatuso is easily redirected. Moreover, Dr. Blumberg proffered that there was "no evidence of mental confusion or psychotic symptoms, like delusions." Some emotional liability attaches, according to Dr. Blumberg, because Rigatuso is dramatic, excited and, during his July 6 interview, cried.

With respect to matters relating to what brings Mr. Rigatuso before the Court—the indictment—Dr. Blumberg testified that Rigatuso appreciated the charges, understands them and their seriousness, the penalties under the Federal Sentencing Guidelines, plea bargaining, and who the principal actors are in the courtroom and what they do during the course of his trial. Moreover, Dr. Blumberg noted Rigatuso's invocation of his Fifth Amendment rights during the grand jury proceedings.

First Assistant United States Attorney Jordan directed Dr. Blumberg to Dr. Spodak's report and, more specifically, the tests given at Dr. Spodak's office. Among others, Dr. Spodak administered the MMPI which stands for a test emanating from Minnesota measuring Personality Inventory.[1] Dr. Blumberg noted that these 500–

plus true and false questions produced an invalid profile and evidence of malingering.[2]

Mr. Irwin's cross-examination began in a general way. He asked the doctor whether in his—Blumberg's—view, Rigatuso suffered from a lifelong history of mental illness. The answer was "yes."

Next, Mr. Irwin focused on LaTourette's. He got the doctor to admit that the tics associated with the syndrome lowered the self-esteem of one who suffers from it. Dr. Blumberg also agreed with Mr. Irwin that Rigatuso expends "huge amounts of energy" trying to control the tics. In short, those who suffer from the syndrome spend ample doses of time just trying to look normal. As a consequence, when a Tourette sufferer is questioned, he or she may be diverting some attention to the question but often are just trying to control themselves.

Next, Mr. Irwin noted that at least three lawyers told Rigatuso not to testify before the grand jury. Dr. Blumberg attributed that decision to poor judgment and "consistent with his grandiose belief in himself." Continuing in this vein, Mr. Irwin asked Dr. Blumberg if he read a copy of Rigatuso's grand jury testimony. After Dr. Blumberg indicated that he had, Mr. Irwin asked him if he remembered a sequence involving a banana. Mr. Irwin pointed to page 44 of the grand jury transcript which included this exchange:

MR. JORDAN: Do you want a drink of water?

THE WITNESS: No thanks.

MR. JORDAN: If you want one—

THE WITNESS: I appreciate that. I basically try to stay on a raw diet all day. I had an apple and I might have a banana later.

MR. JORDAN: Don't eat bananas—

THE WITNESS: Why? Gassy? You are welcome to half of it.

---

1. The Court confesses that in taking notes during the hearing it did not catch what the second "M" in MMPI stands for, but it is a well-established test.

2. Malingering was never explained to the Court, but the Court infers that Rigatuso's answers were inconsistent and therefore endorsed symptoms inconsistent with a disorder.

Although the record doesn't reflect it, Jordan and Rigatuso confirm that Rigatuso pulled out a banana and ate at least some of it. Again, Dr. Blumberg attributed this conduct, as well as conduct by Rigatuso which is done for effect but may be self-destructive—like testifying before a grand jury—as the product of poor judgment.

When Mr. Irwin moved to the Obsessive Compulsive Disorder and the Narcissistic Personality Disorder, Dr. Blumberg testified that despite these problems, Rigatuso was competent to stand trial.

On redirect, Mr. Jordan elicited testimony from Dr. Blumberg that Rigatuso, at the end of their appointment, pulled out a list of psychological problems he had wanted to verify he had covered with Dr. Blumberg. To the doctor, this pointed to Rigatuso's awareness of his need to be found incompetent and to use any means possible to get there. Finally, Mr. Jordan adduced from Dr. Blumberg that it was not unusual—especially for a white-collar criminal defendant—to reject his attorney's advice. The government then rested.

Through Mr. Irwin, the defendant called John A. Francomano, a partner in the law firm of Cohan & Francomano. The witness has been a lawyer for about twenty years. He met Rigatuso late (*e.g.*, November–December) in 1988. They met to discuss Rigatuso's legal problems. At the time, Rigatuso had "8 or 9 law firms" representing him. In early 1989, Mr. Francomano represented Rigatuso in a matter before the Attorney General of Maryland's Consumer Protection Division, who brought as the plaintiff a civil suit against Rigatuso. In a hearing on April 13 or 14, Mr. Francomano looked over at Rigatuso and noticed his eyes bulging out. In addition, he was sweating profusely, appeared agitated and, at the same time, frozen in his seat. Mr. Francomano prevailed upon the administrative law judge to excuse Rigatuso from the remainder of the proceedings. Nevertheless, Mr. Francomano told Rigatuso to stick by the phone at his office in case he had a question during breaks in the hearing. Often, Rigatuso did not.

Mr. Irwin asked Mr. Francomano if he could, in general, communicate with Rigatuso. He said he could not and proffered an example: When he asked Rigatuso to provide material on Item A, Rigatuso gave him everything relating to Item B. Finally, Mr. Irwin asked Mr. Francomano if Rigatuso was able to assist him in the Attorney General proceeding, to which Mr. Francomano replied, "No."

Mr. Jordan crossed the witness for five minutes, establishing that Mr. Francomano never saw Rigatuso testify in any forum, that Mr. Francomano did, however, receive Rigatuso's grand jury testimony, and that, to Mr. Francomano, Rigatuso gave relevant answers about his credit card operation. With respect to the Attorney General matter, the three causes of action included the credit card operation, "SANTO GOLD"—a jewelry concern—and Rigatuso's "Millionaire Give–Away." Mr. Francomano testified that Rigatuso was able to explain these operations to him such that Mr. Francomano could mount a defense.

Redirect focused on Rigatuso's habit of telling Mr. Francomano that a witness would testify about "X" when in fact the witness would say "Y." Mr. Jordan elicited from Mr. Francomano that in litigation this is not an isolated phenomenon.

Dr. Spodak testified for fifty-two minutes. He differs from Dr. Blumberg in that he is not "Board Certified" in forensic psychiatry. He is an expert nonetheless, and has testified at least twenty-five times a year in court for the last eight years.

Dr. Spodak interviewed Rigatuso on four occasions: April 20 and 24, and May 12 and 24, spanning six or seven hours. His opinion is that Rigatuso has a mental disease or defect which does affect his ability to assist in his own defense.[3] Like Dr. Blumberg's report, Dr. Spodak's report will also become part of the Court file.

---

**3.** Dr. Spodak's opinion letter of May 15 at page 4 embraced two theories: (1) that Rigatuso was unable to understand the nature and consequences of the proceedings against him; and (2) that Rigatuso was unable to assist properly in his defense. At the hearing, however, Dr. Spodak jettisoned his first theory and focused solely on the assistance prong of § 4241(d).

In Dr. Spodak's words, he and Dr. Blumberg arrived at the same disorders from which Rigatuso suffers. That is the three disorders mentioned earlier: obsessive-compulsive, narcissistic and Tourette's.

According to Dr. Spodak, Rigatuso's behavior is marked by eighteen traits:

1. constant need for reassurance;
2. overemotional;
3. seek to be center of attention;
4. rapid shift of emotion;
5. self-centered;
6. low tolerance;
7. wants immediate gratification;
8. speech excessively expressionistic and lacking detail;
9. grandiosity;
10. exaggerates;
11. sense of entitlement;
12. preoccupied with how well he is doing—wants feedback;
13. need for constant admiration;
14. preoccupation with rules;
15. stubborn insistence that things be done his way;
16. indecisive;
17. procrastination; and
18. physical and verbal tics.

*Spodak's Summary*

a) speech problem marked by excessive expression and lacking in detail;
b) preoccupied with how well he is doing;
c) can't see the forest for the trees; and
d) stubborn insistence.

Many of these traits seem to either overlap or describe the identical problem in two or three ways. In addition, the Court knows a number of lawyers and judges which share at least some of these traits with Rigatuso. But, Dr. Spodak did emphasize that while a number of people may have at least some of these traits, Rigatuso has them to an extreme such that the nature, degree and number meld into a disorder—a disorder that, in Dr. Spodak's view, makes Rigatuso incompetent to stand trial.

As Mr. Irwin's direct examination proceeded, Dr. Spodak further related that Rigatuso takes an inflated view of himself, that some rules don't apply to him, that everything he has done is important so he does not "sort out the major details from the minor," that his speech is "all over the place" and thus cannot "zero in on an answer," that if Rigatuso—down the road—is convicted he still believes in terms of sentence, that he will walk out of the courtroom "unscathed" because he believes he "is special" and, finally, that he has difficulty concentrating on a proper answer because he is trying to keep his physical tics under control.

Mr. Jordan's twenty-minute cross of Dr. Spodak first revealed that Dr. Spodak had not read a copy of the indictment which he conceded "would have been helpful," and that he had not read any prior Rigatuso transcripts. Dr. Spodak also agreed with Mr. Jordan's proposition that if Rigatuso was able to give detailed relevant information to the grand jury, then this would have some bearing on properly assisting his counsel. In addition, Rigatuso's assertion of his Fifth Amendment rights during his grand jury appearance also shed light on assisting Mr. Irwin.

Mr. Jordan also got Dr. Spodak to concede that criminal defendants do not always agree on counsel's advice regarding, for example, taking the witness stand at trial or confessing. Dr. Spodak acknowledged that Rigatuso had never been hospitalized for his problems and that Rigatuso does not suffer from psychotic thinking, although Dr. Spodak was careful to note that psychosis is not synonymous with incompetence. Dr. Spodak also testified on cross that Rigatuso had a high average intelligence.

Rigatuso was the final witness. He is 44 years of age and was born in Baltimore. His father and grandfather were barbers. At the age of 12, Rigatuso was taken by his parents to a psychiatrist because "he was different." At that time, he was diagnosed with Tourette's. For years, Rigatuso testified, he has seen a psychiatrist six times a week. While in the eighth grade, his father died and he then supported his mother. Over time, Rigatuso was a bar-

ber, ran a confectionery store and produced a movie, "Blood Circus," which *Evening Sun* movie critic Lou Cedrone remarked "had been made by someone on drugs."

Rigatuso's direct revealed further that over the past ten years he has employed a plethora of lawyers, that he is bad "with paper," that he feels "like a freak inside," that he wants 3,500 witnesses to testify at his trial, and that he is an intelligent person within a tortured body.

Drs. Blumberg and Spodak agree that Rigatuso suffers from mental disorders. They part company, however, on the issue of whether the disorders make Rigatuso incompetent. Dr. Spodak says they do; Dr. Blumberg says they do not.

Just where disorders end and incompetence begins defies easy demarcation. But the Court makes a few observations.

The first deals with Mr. Irwin's effort at the hearing to demonstrate that Rigatuso has a mind of his own when it comes to accepting or rejecting his advice. Appellate courts have determined that a defendant's failure to follow his counsel's advice is not by itself a sufficient basis to find incompetence. *Guam v. Taitano,* 849 F.2d 431, 432 (9th Cir.1988); *DeKaplany v. Enomoto,* 540 F.2d 975, 983 (9th Cir.1976). These holdings are consistent with the approach of the ABA's Model Rules which were adopted by the ABA in 1983.[4] Model Rule 1.2 provides, in pertinent part, that:

> In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to plea to be entered, whether to waive jury trial *and whether the client will testify.*

The ABA Code, in Ethical Consideration 7–7, states, "the authority to make decisions is exclusively that of the client...." Thus, it is the client who must make the key decisions that affect the client's substantial legal rights, such as testifying before the grand jury which Mr. Irwin did not approve of. Rigatuso's decision to testify

before the grand jury may have been less than sagacious[5] but his motive for testifying, though naive, was rational:

> Okay. On December 16th I was invited here by the Grand Jury as an invitation. I would just like to make it clear this was not a subpoena. I came here on my own free will and here is the letter that they had sent me.
>
> Second of all, I've had four or five attorneys tell me not to come here because it's a one-sided issue basically. The job of the prosecutor is to get me indicted I guess and I feel there's two sides to a story. You heard different hostile employees—you heard current employees say different things. I would like a chance to defend what they are saying[.]

Government's Exhibit 3 at 5.

Second, it is undisputed that Rigatuso suffers from mental disorders but paranoid schizophrenia does not necessarily require a finding of incompetence, *United States v. Caraza,* 843 F.2d 432, 437 (11th Cir.1988); *cf., United States v. Evans,* 704 F.Supp. 81, 83 (E.D.Pa.1989) (defendant found incompetent as a result of being diagnosed with schizophrenia, paranoid type), nor does bipolar mood disorder, *Bundy v. Dugger,* 850 F.2d 1402, 1408–09 (11th Cir.1988), neither does a genuine belief that one is "Confederate General Nathan Bedford Forrest, who, born in 1821, was the first imperial wizard of the Ku Klux Klan." *United States v. Birdsell,* 775 F.2d 645, 648 (5th Cir.1985). In addition, defendants suffering from obsessive compulsive personality disorder have also been found competent, *United States v. Oren,* 622 F.Supp. 936, 937 (D.C. Mich.1985), as well as defendants suffering from narcissistic personality disorder with histrionic, anti-social and compulsive features. *United States v. Baraban,* 599 F.Supp. 1171, 1177 (S.D.Fla.1984).

Third, all who have associated with Rigatuso observe that he tends to ramble when

---

4. Maryland adopted the Model Rules of Professional Conduct effective January 1, 1987, thus displacing the Model Code of Professional Responsibility.

5. "While I, as a former trial attorney, might not consider this a prudent course, I note that prudence is not the equivalent of competence." *United States v. Oren,* 622 F.Supp. 936, 938 (D.C. Mich.1985).

answering a question.[6] But that, too, is not grounds for incompetence. *Flugence v. Butler*, 848 F.2d 77, 79–80 (5th Cir.1988); *United States v. Birdsell*, 775 F.2d 645, 649 (5th Cir.1985).

■ Law and precedent aside, the Court finds Rigatuso has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and, therefore, is competent to stand trial. In observing the defendant, the Court does not dispute that Rigatuso has Tourette's—after all both experts agree on this one. But his tics are unremarkable in nature and degree. While he does twitch in the mouth and nose area on a regular basis, it is by no means the type of activity that would cause people to stare at him. His tics are not unusual, at least in this Court's eye.

Also, on at least three occasions during the hearing, Rigatuso jotted down notes and passed them to Mr. Irwin. At least one of them seemed to form the basis of a question to Dr. Blumberg on cross to the effect that, "Isn't it true Rigatuso is tortured by his problems?" The two other notes may or may not have formed the basis for a question but Mr. Irwin did nod his head in agreement.

Finally, Rigatuso is able to relate events about both his life and his business. He can impart information about how his credit card operation worked and his other business ventures. He also knows when not to. His grand jury testimony reflects his invocation of the Fifth Amendment on more than a few occasions. *See* Exhibit 3 at 29, 30, 39, 77, 102, 117, 130, 141(2), 144(2), 145 and 154.

In *United States v. Makris*, 535 F.2d 899 (5th Cir.1976), the Court of Appeals stated:

In the final analysis, the determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney.

*Id.* at 908.

Finding a defendant competent simply because he passes his attorney a few notes during a competency hearing, or because his nervous tics as a result of Tourette's Syndrome seem much less severe than anticipated, would border on an abuse of discretion. In the same view, finding the defendant competent on the strength of a federal district judge's "gut" reaction would also be tenuous. Moreover, it is undisputed that Rigatuso has some serious emotional difficulties. But it would be equally abusive to find defendant incompetent because his past and present attorneys find him frustrating to work with. That a person would be found incompetent because he cites evidence supporting position "A" to support proposition "B" would endanger a not insignificant segment of the bar.

Rigatuso is competent because he can assist his attorney and assist in his own defense. He understands his business operations which form the basis of the indictment lodged against him. He is intelligent, articulate and sincere. He requires patience when talking with him, but he is not incompetent. Indeed, Rigatuso is motivated to help his case and is able to disclose to Irwin relevant facts surrounding his operation. The Government has carried its burden.

SO ORDERED.

---

**6.** Very few attorneys can control a witness like Mr. Irwin and he easily re-directed defendant during his testimony, making for a lucid presentation of his competence *vel non.*