UNITED STATES of America, Plaintiff,

v.

Anthony D. LIBERATORE, Defendant.

No. 1:92CR184.

United States District Court,
N.D. Ohio, E.D.

March 10, 1994.

James R. Wooley, Ann Rowland, Asst. U.S. Attys., Cleveland, OH, for plaintiff.

J. Michael Murray, Jeremy A. Rosenbaum, Berkman, Gordon, Murray, Palda & DeVan, Cleveland, OH, for defendant.

### ORDER

SAM. H. BELL, District Judge.

On August 20, 1993, defendant was to be sentenced as a result of his conviction on nine felony counts. Three hours prior to sentencing, defendant filed a motion under 18 U.S.C. § 4241 seeking a hearing to determine his competence to be sentenced. That motion was supported by affidavits from Elmer Giuliani and Albert Giuliani.[1] The former, a longtime personal friend of the defendant, was also defendant's original trial counsel but withdrew shortly before the trial for reasons of health. The latter, also an acquaintance of the defendant for over 20 years, succeeded his father as lead trial counsel. The content of the affidavits was sufficient to raise the issue of defendant's ability to understand the nature of the sentencing proceedings and raised the possibility that defendant could not offer his attorney assistance to the extent required at the sentencing phase of a federal criminal prosecution.

Pursuant to 18 U.S.C. § 4241(b), this court ordered defendant remanded to the custody of the Medical Center for Federal Prisoners in Springfield, MO for psychological evaluation. Dr. Robert L. Denney, Psy. D., prepared and filed a report based on that evaluation. This court also ordered that defendant be examined by Dr. Kurt A. Bertschinger, M.D. Finally, upon defendant's motion, this court permitted defendant to be evaluated by Dr. Charles A. deLeon, M.D. Drs. Bertschinger and deLeon also filed reports and testified.

Pursuant to 18 U.S.C. § 4241(c), a hearing was held. Over the course of two days, the court heard testimony from all three doctors, the Giulianis, prosecuting attorney James Wooley and Federal Bureau of Investigation case agent Jerry Personen. The government played six logger tapes of phone calls made by defendant while at Springfield. The defense played one logger tape. In addition, the government submitted 20 other tapes comprising the complete set of defendant's phone calls while under evaluation at Springfield.[2] The court has reviewed the tapes not played at the hearing.

> Section 4241 provides in pertinent part:
> If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d).

The procedures outlined in section 4241 are designed to protect defendant's due process right not to be tried while mentally incompetent. As the parties are well aware, this court has recently had occasion to discuss the issue of a criminal defendant's substantive protection from trial while incompetent. *See Lagway v. Dallman* 806 F.Supp. 1322, 1331–1332 (N.D.Ohio 1992). Since that opinion, the Supreme Court has once again discussed the same issue.

In *Godinez v. Moran*, —— U.S. ——, ——, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321, 330 (1993), the Court considered what standard of competence is to be applied in determining whether a guilty plea or the waiver of the right to counsel were valid. In conjunction therewith, the Court reaffirmed the general application of the so-called *Dusky* standard upon which this court relied in *Lagway*. Specifically, the Court held, "the standard for

---

1. Albert and Elmer Giuliani will be referred to on frequent occasion by their first names. This is done only to distinguish which of them is the subject of discussion and not because of disrespect or overfamiliarity.

2. The logger tapes do not include phone calls made by defendant to counsel.

competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him." *Id.*, *quoting Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960) (per curiam).

It appears, however, that possibly certain Justices may entertain the opinion that while *Dusky* is the appropriate standard during pretrial and trial phases, a different, unarticulated standard, may govern sentencing. Justices Kennedy and Scalia, in a concurrence, explained: "We have not suggested that the *Dusky* competency standard applies during the course of but not before trial. Instead, that standard is applicable from the time arraignment through the return of a verdict." *Id.*, —— U.S. at ——, 113 S.Ct. at 2688, 125 L.Ed.2d at 335 (Kennedy, J., concurring).

Even assuming that the view expressed in Justice Kennedy's opinion is not embraced by a majority of the court, the rationale which supports limiting *Dusky* to pre-verdict phases is similar to the rationale which leads courts to tailor the application of *Dusky* to the particular circumstances. Specifically, appellate courts have recognized that in certain non-trial proceedings, such as sentencings and probation revocation hearings, "the test is whether the defendant is able to understand the nature of the proceedings and *participate intelligently to the extent participation is called for.*" *Chavez v. United States*, 656 F.2d 512, 518 (9th Cir.1981), (citing *Sailer v. Gunn*, 548 F.2d 271, 274 (9th Cir.1977) ("consideration should be given to the extent to which he can be expected to participate in those proceedings and the nature of that participation.")) Stated more fully:

> Trial courts must assess a defendant's competence with specific reference to the gravity of the decisions the defendant faces. *de Kaplany v. Enomoto*, 540 F.2d 975, 985 (9th Cir.1976) (en banc), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977). The test for competence is thus traditionally stated in differ-

ent terms depending upon the decisions and consequences presented to the defendant by the particular proceeding. It might be constitutionally fair to require a marginally competent defendant to make certain kinds of decisions, but not others. *Id.* 656 F.2d at 518.

Necessarily, then, as this court considers the evidence, it does so in recognition of the fact that the current inquiry relates specifically to defendant's present capacity to be sentenced. The instant question presented is not defendant's competence at the time of trial. Likewise, we do not now consider defendant's competence at some point in the future when he may wish to assist in an appellate procedure. Accordingly, this court now considers the evidence to determine whether defendant understands the nature of the sentencing proceeding and can offer the kind of rational assistance expected of a federal defendant in conjunction with the sentencing phase of his prosecution. To do so properly, the court must make specific findings of fact.

## I

■ The Giuliani's testimony is but marginally relevant to the instant proceeding. Neither Giuliani testified about recent contact with the defendant. Rather, in the case of Albert, the testimony primarily related to impressions of the defendant immediately before and during trial. Albert did testify that he attempted to speak to defendant about sentencing a number of times immediately after the verdict but that defendant was not coherent. Albert dictated a statement which the defendant was to deliver to the probation officer to stating that defendant would not answer questions because he intended to appeal.

Elmer's testimony focussed primarily on his impression of the defendant from a jail visit shortly after the jury returned the guilty verdicts. As evidence of defendant's current mental condition, this anecdotal testimony is of little value.

The Giulianis' testimony is of note, however, because both Dr. Denney and Dr. deLeon used the Giulianis as sources for their re-

ports. To that extent, the court must consider the testimony to determine if the primary information which provides substantive factual support for the experts' opinions is credible.

Albert Giuliani testified that the defendant was often difficult to work with because, from day to day, the defendant did not recollect what had been previously discussed. Shortly before the trial, Albert told the defendant that in the interest of allowing counsel to focus on pretrial preparation, he had to cancel their practice of daily meetings. Albert also testified that the defendant seemed worse in the afternoon.

The testimony further indicated that defendant seemed to improve at the beginning of the trial, but that as the trial progressed, and specifically once the prosecution began playing various logger and interview room tapes, his behavior became more difficult. Ultimately, Mr. Giuliani explained that co-counsel Robert Dixon was designated to deal with defendant's questions because Albert could not continue to re-explain things to the defendant and focus on the trial.

The testimony of Elmer Giuliani described defendant as looking awful when he visited him at the jail after the conviction. Defendant told Elmer that he was afraid in his cell because he saw a naked woman with flowers around her neck lying on his bunk and that he saw rats and worms. Elmer indicated that it was impossible to discuss questions relating to sentencing issues.

With respect to the hallucinatory episodes, some of the expert witnesses indicated that hallucinations are inconsistent with the dementia diagnosed. Dr. Bertschinger further explained that there are many explanations including toxicity, anxiety related to sudden relocation or malingering. Toxicity could arise from a change in the battery of medicines which defendant takes due to heart disease. Dr. Bertschinger also indicated that many older people suffer hallucinations for a short time when they are abruptly moved to a new environment like a nursing home. The same rationale could apparently apply to an individual, such as the defendant, who is abruptly taken into custody and returned to jail, especially when it appears defendant was

led to believe that the jury deliberations would take considerably longer than the three hours which actually occurred. Finally, it is not necessary to comment extensively on the possibility of malingering except to add that Dr. Bertschinger indicated that delusions are often problematic because they are difficult to confirm.

Thus, this court discounts the testimony relating to hallucinations. First, aside from Elmer's testimony and a single reported sighting of rodents in his cell when he first arrived at Springfield, there is no evidence of further, and certainly not recent, hallucinations. Defendant never mentioned delusions of any kind in his phone conversations with his family. The record suggests that whatever may have caused the visions, if they in fact did occur, is no longer present. Second, the mental health experts who testified did not regard the hallucinations as significant and did not appear to factor possible hallucinations into their capacity assessments.

Albert Giuliani's testimony regarding defendant's ability to understand legal advice and participate in his defense poses a different problem. As a cursory review of the record in this case will indicate, the court and counsel had occasion to spend a great deal of time together through every phase of the trial. This proceeding was marked by consistent professionalism and cordiality between the defense and prosecution as well as between the attorneys and the bench.

At various times during the trial, the attorneys, very properly, brought issues to the attention of the court which arose outside the presence of the court or the other party. For example, while the defense initially planned on offering the testimony of Larry Dean Dusenberry, as soon as defense counsel learned that Dusenberry intended to exercise his Fifth Amendment right against self-incrimination on cross-examination, it was brought to the court's attention so counsel could be secured for Dusenberry and a potential mistrial situation averted. Ultimately, despite defendant's apparent confidence that the testimony of Dusenberry would exonerate him, the testimony was not used because it appeared to be relatively certain

that Dusenberry would refuse to answer questions on cross-examination.

At that time, Albert Giuliani stated:

Last night Mr. Dixon and myself discussed this matter. We certainly did not want to be withholding this information from the court. We also did not want to be a part of anything that would look like it was an act on our part to pull a sham on the court or the prosecution, because we feel as of this point the court has done everything possible to keep this a fair trial.

(Trial tr. at 1158.)

This anecdote does not directly bear on the issue of competence. It does, however, illustrate the context for this court's confidence that the attorneys remained candid with the court throughout the trial and actively followed a conservative ethical course during the trial to avoid the specter of injecting error. It is in this context which the court must consider Mr. Giuliani's post-trial statement. The theme of this statement is best summed up in his affidavit supporting the motion for this hearing:

At first, I attributed this inability on defendant's part to his age, limited education and generally poor health as well as the rapid, fatiguing pace of trial. However, by the end of trial and particularly during the last two days of trial, defendant's condition deteriorated dramatically to the point that, in hindsight, I now question whether he was competent to receive the jury's verdict.

(Albert Giuliani aff. at ¶ 5.)

While it is considered axiomatic that hindsight is 20/20, that is not in fact always the case. An individual's perception of events is always colored by context, whether the events are occurring contemporaneously with the assessment or occurred sometime in the past. Indeed, experience with witnesses over the years confirms that explanations of the past are constantly tempered by considerations of the present.

The court is forced, in evaluating the credibility of this attorney's assessment, to consider the long relationship he has had with the defendant. In 1972, Albert met the defendant when he sought a summer job with the Laborer's Union. The relationship started then and continued through the years, facilitated by Albert's father's close friendship with the defendant. Through the vicissitudes of this long prosecution, the court does not doubt that whatever bond existed before Albert became defendant's attorney, his sympathy for the defendant increased.

Yet, at the time of trial, the record clearly indicates that counsel did not raise any concern relating to the defendant's mental health. At the same time, the court was made well aware of the long-term physical problems suffered by defendant relating to his heart and lung conditions and how they might impact on the course of the trial day. The court, as a result, attempted to be sensitive to requests for breaks or recesses because of health reasons and frequently observed the condition and conduct of the defendant to assure that defendant was not, in fact, finding it too difficult to remain attentive due to the length of the trial day.

By no means does the previous paragraph imply that this court believes that its contact with defendant was sufficient to reject the assessment of his counsel who plainly had more extensive and substantive experience with the defendant. Indeed, having discussed *Lafferty v. Cook*, 949 F.2d 1546 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992), in *Lagway*, this court is well aware of the caution which is advisable in relying upon demeanor as a basis for determining competency. The fact that Mr. Giuliani did not contemporaneously report his client's allegedly inappropriate conduct of which he now complains requires this court to consider more closely the particular behavior in question.

For example, Albert testified that defendant's attention improved between the time of the cancellation of further daily meetings for pretrial preparation and the beginning of the actual trial. Albert indicated that defendant's regression during the trial, if that is what it was, corresponded approximately to the point in the trial when the government began playing tape recordings. The substantive evidence of the overt acts underlying the racketeering charge were, in large part, established through those recordings. While

defendant's regression could be explained as a result of a mental defect, the regression is also susceptible to the more conventional explanation that as highly inculpatory evidence was presented, he became more withdrawn and depressed. Likewise, given remarks by both the defendant and his ex-wife that he has been the target of a 'federal vendetta' manifesting itself through a pattern of invasions of privacy, the defendant may well have resented hearing his intercepted conversations with friends and family played in open court.

Counsel also testified that defendant responded in an inappropriate way to the testimony of Mr. DeLucca. And indeed, for trained counsel to believe that DeLucca's testimony was anything but what he termed a 'catastrophe' would strain credibility. It must be understood, however, that DeLucca testified out of order. Due to his limited availability, the prosecution allowed the defense to offer DeLucca's testimony during the prosecutions case. DeLucca, a longtime friend and business associate of the defendant, to that point in the trial, was the only witness to say anything good about the defendant.

In this court's experience, it is not unusual for a defendant to only recognize the good things that friends say and not to recognize the damage, sometimes substantial, inflicted through cross-examination. This is not necessarily the result of impaired mental capacity, but is again the result of the prisms through which all individuals view experiences.

This court does not doubt that the defendant was, at times, of only marginal assistance to his attorneys. Again, given his education and substantial life experience spent behind bars, this fact is not surprising. After trial, however, another firm undertook defendant's representation. This provided an opportunity for Albert to set aside the sound professional judgment consistently exercised during the course of trial and to consider the events more personally.

As an attorney, Mr. Giuliani concluded that there was nothing irregular and proceeded through the trial. We note, parenthetically, that Robert Dixon, co-counsel upon whom responsibility for answering defendant's questions during trial devolved, no doubt shared this assessment because he did not raise this issue at any time, nor has it been implied that he even suggested the issue. Now however, as a friend, as well as advocate, Mr. Liberatore's attorney may well perceive a different reality derived from the same factual predicate.[3]

This court perceives nothing sinister in Albert's present assessment of the defendant's capacity. But in evaluating the testimony in light of the other evidence, including this court's observation of defendant contemporaneous with Albert's observations, we must make a credibility assessment. There are, as the jury charge in this case explained, many components to credibility, including bias. Every witness has a bias and the fact finder has the obligation to determine that bias and consider it in conjunction with the testimony considered as a whole.

The court finds that the specific conduct described by Mr. Giuliani is often susceptible to more than one explanation. At the time of trial, counsel concluded that one explanation was more probable. Now, counsel asserts a very different explanation which substantially impacts on defendant's rights during trial as well as now. Respectfully, this court is inclined to place greater weight on counsel's contemporaneous assessment of the defendant's circumstances both because such an interpretation is more consistent with what the court personally observed and because the court suspects, given the high degree of professionalism exercised throughout the trial, that the first assessment was less influenced by a personal relationship with the defendant which may now color judgment in light of the jury verdicts.

To the extent that Elmer Giuliani's testimony is consistent with that of his son, the same reasoning militating in favor of discounting its credibility applies. And as previously indicated, Elmer's testimony relating to hallucinations is not consistent with the

---

3. Mr. Dixon neither filed an affidavit nor testified that he presently believes that defendant is cur-
rently incompetent or that his behavior at trial, viewed retrospectively, indicates incompetency.

expert assessments and if the delusions really occurred, they apparently represent a post-verdict condition which quickly passed.

In sum, this court is wary of placing great reliance on the testimony of the Giulianis. First, the evidence itself is of limited relevance to the question currently posed—is the defendant *presently* competent? Second, the evidence is in places of no apparent significance to the mental health experts, notwithstanding the shock value which hallucinatory episodes may have to a lay person. Third, the assessments now before the court are inconsistent with assessments made at trial and appear to suffer from a more personal motive than the disinterested professional judgment exercised at the time of trial.

## II

It is appropriate, therefore, to now consider the testimony and reports of the mental health experts. These reports are necessarily more probative of the capacity issue both because of the greater expertise of the evaluators and because the evaluations were geared to the current question of present capacity. Presumably, the evaluators are also more objective than longtime personal friends may be.

Before considering the experts, it is appropriate to briefly revisit a subject which this court considered in *Lagway*—the role of mental health experts in competency determinations. To that end, it is worth repeating two passages quoted in *Lagway*.

> The question of competency calls for a basically subjective judgment.... [T]he competency determination depends substantially on expert analysis in a discipline fraught with subtleties and nuances. Consequently, it is this Court's job to weigh the evidence and determine questions of credibility. Faced with a record that supports conflicting inferences, this Court must consider the opinions of the psychiatric experts in light of the surrounding circumstances and determine which opinion is more realistic and credible given the evidence presented. Further, in considering competency, the Court may rely on, in addition to expert testimony, lay witness testimony concerning the Petitioner's rational behavior, and cross-examination of petitioner's expert.

*United States v. Rigatuso,* 719 F.Supp. 409, 416 (D.Md.1989). Objective reasons for rejecting an expert's opinion include:

> (1) the correctness or adequacy of the factual assumptions on which the expert opinion is based;
>
> (2) possible bias in the expert's appraisal of the defendant's condition;
>
> (3) inconsistencies in the expert's testimony, or material variations between experts; and
>
> (4) the relevance and strength of the contrary lay testimony.

*Strickland v. Francis,* 738 F.2d 1542, 1552 (11th Cir.1984).

The court's analysis and eventual decision in this matter must be based on the totality of the evidence submitted. The opinion evidence offered by the physicians who testified and submitted written reports concerning their findings is a part of that totality. It is obvious that each of the examining doctors is qualified and capable of performing the tests employed by them to assess the competency of this defendant.

In assessing the validity and assigning the weight to be given to the opinions expressed, it is necessary to go beyond the persuasion of technical expertise. One must inquire concerning such items as the basis of the opinion, the adequacy of psychological testing procedures, the hypothesis of fact taken to begin the analysis of defendant's difficulties, and the dependency or lack of dependency on the views and opinions of others (as well as the reasonableness of doing so). One must also inquire whether the opinion is materially different now than it was at some point in the past, and the firmness of the opinion when tested by new facts or hypotheses or, indeed, facts unknown at the time of testing. This court must also consider the adequacy of the testing process from a temporal standpoint, the statements of defendant known to the examiners (not limited to those made in an interview setting) and, of course, the interest of the examiners, if any, in having their opinions accepted and

their interest in the outcome of the case. Again, the court must make definitive findings of fact.

With these standards in mind, we turn to the report and testimony of Dr. Denney.

In Denney's opinion, defendant suffers from "primary degenerative dementia of the Alzheimer type, senile onset, uncomplicated." The impact of this condition was reported as follows:

> His current mental condition impacts his ability to participate in legal proceedings in several ways. He will have difficulty following lines of reasoning when discussing his defense with counsel. He will have difficulty remembering what occurred during previous discussions. He may very well have difficulty recalling events to accurately assess merits of the Presentence Report. In addition, his memory impairment would hinder his ability to testify on his own behalf. Lastly, his mental condition and orientation will fluctuate to some degree on a daily basis, such that it would be impossible to predict when he would be his best. Although Mr. Liberatore appears to be an intellectually capable individual during brief conversations, in-depth questions and discussion reveal serious impairments.
>
> In this evaluator's opinion, Mr. Liberatore suffers from a mental disease or defect rendering him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him or assist properly in his defense.

(Denney at 9.)

On its face, this report is somewhat problematic because it appears that Dr. Denney did not originally understand the nature and consequences of the proceedings which defendant now faces and did not appreciate the kind of assistance he would be called on to give his attorney. For example, the right of allocution which defendant does have is far less complex than the right to testify before the jury, or for that matter, the right not to testify.

At the hearing, Dr. Denney clarified his position vis á vis defendant's ability to perform tasks appropriate to the sentencing phase of a prosecution. In fact, Dr. Denney, reversing the conclusion in his report, confessed that as to the nature and consequences of the sentencing, it would be easy for the defendant to understand the sentencing. When examined by defendant's counsel as to whether the defendant was impaired or significantly impaired in his ability to give assistance, Dr. Denney's answers tended to indicate that the defendant was impaired. Unfortunately, Dr. Denney's answers were necessarily predicated, on occasion, on the assumptions about competence made by defense counsel.

■ Contrary to the belief of the defendant, this court does not believe that at sentencing, a defendant need have the ability to rationally and meaningfully discuss the substance of rulings relating to the admission of evidence. Nor is it relevant whether the defendant can provide any assistance relating to deciding what issues should be raised on appeal. Likewise, the court believes that while a defendant must understand the nature of the charges and have some understanding of the underlying factual context of the case, the defendant need not possess the degree of sophistication necessary to understand the specific technical procedures for seeking a new trial through post-trial motions. All of these functions should be provided by counsel.

At this juncture, it is appropriate to note that references to sentencing refer not only to the elements of sentencing which render each case different from others, but also to the process itself, here governed by the guidelines of the Federal Sentencing Commission. Defendants and counsel are presently confronted by defined, multifaceted, and generally specific standards that determine both the probable measure of the sentence to be imposed (the guideline range) and the exactness of that sentence (the placement of the penalty within the guideline range).

This being so, our inquiry must address the competency of the defendant in relation to sentencing in general as well as to his competency as it relates to the present method of configuring the sentence to be imposed.

Thus, we consider his ability to assist counsel in confirming the correctness of the chosen scoring for acceptance of responsibility, relevant conduct and criminal history. We must also consider other such guideline criteria. To the degree that defendant may 'speak' in mitigation in the presentence report, we must consider his ability to assist his counsel in doing so in the same manner that we consider his ability to perform the same or similar function by way of allocution.

While every defense lawyer hopes that his client will possess high degrees of reason and eloquence, the reality is often quite different. "Even perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers. That level of comprehension is not a requirement of competency." *United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir.1993) (upholding trial court finding that 74–year old Alzheimer victim was competent to stand trial). In passing, we note that given defendants limited education and lifetime of frequent and lengthy incarceration, it is possible that this defendant never had the abilities to which his counsel now claims defendant must aspire. Further comment on this possibility, however, is inappropriate because the evidence does not include historical evidence of defendant's intelligence.

A review of case law further indicates that defense counsel may have been incorrect in suggesting that defendant must be incompetent because he does not remember details from his past in as much as courts have upheld the conviction and sentences of individuals suffering from anteriorgrade amnesia even when the amnesia extends to the crime itself.

A defendant's amnesia about events surrounding the crime will not automatically render him incompetent to stand trial. *United States v. Sullivan*, 406 F.2d 180, 186 (2d Cir.1969). Rather, the propriety of trying a given amnesiac defendant must be determined in light of his own individual circumstances. Factors to be considered include whether the defendant has any ability to participate in his defense, whether the amnesia is temporary or permanent, whether the crime and the defendant's whereabouts at the time of the crime can be reconstructed without his testimony, whether the government's case is strong or weak. *See e.g., United States v. Rinchack*, 820 F.2d 1557, 1569 (11th Cir.1987); *United States v. Swanson*, 572 F.2d 523, 526–27 (5th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978).

*United States v. Villegas*, 899 F.2d 1324, 1341 (2d Cir.), *cert. denied*, 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990).

While no attempt was made here to address the factors in this test, it must be noted that in the instant case, as in *Villegas*, the voluminous government records, including hundreds of taped conversations, as well as defendant's extensive and well-chronicled criminal past, make it possible for counsel to reconstruct defendant's relevant conduct and criminal history for sentencing classification purposes. Likewise, this court is persuaded that the case against defendant is strong. This judgment is buttressed by the fact that the jury deliberated and returned nine guilty verdicts in only three hours.

In sum, even if defendant had total memory loss concerning his criminal history and the events surrounding the crime, a finding of incompetence is not mandatory. In fact, under the circumstances prevailing in the instant cause, such a finding is contraindicated under the relevant standard. Moreover, unlike a total amnesiac who has no recollection, the record indicates that the defendant does have some considerable recollection which could prompt defense counsel to make inquiries which no doubt would lead to additional information.

Dr. Denney's testimony poses some difficulty in analysis. To the extent that his opinions relating to defendant's ability to assist counsel are at least in part derivative of information contained in the partisan affidavits filed by defendant's family and friends, this court must view such opinions with caution. To the extent that his opinions rest on inaccurate assumptions about the applicable legal standards for competency, this court must reject them. And in any case, Dr. Denney's opinion must be considered in light of material variations between his opinion

and the opinion rendered by Dr. Bertschinger.

Before moving on to Dr. Bertschinger, it is appropriate to briefly discuss the report and testimony of Dr. deLeon, the psychiatrist retained by defendant. While it appeared that Dr. deLeon carefully and professionally examined the defendant for one hour, it is also apparent that his opinion primarily rests on written sources which were available and on interviews with members of the defendant's family. Dr. deLeon apparently placed great emphasis on Dr. Denney's report. In fact, Dr. deLeon wrote:

> I would like to comment that Dr. Denney's forensic report is one of the most excellent, complete and thorough such reports I have ever seen. In fact, my experience over the years with Federal Agencies has long since caused me to regard the medical and psychological/psychiatric personnel at the Springfield Barracks as real models of thoroughness, competency and objectivity.

(deLeon rep. at 2.) In light of the fact that Dr. Denney's testimony was significantly different than his written report, Dr. deLeon's overwhelming reliance on the report must be questioned.

As previously discussed with reference to the Giulianis, this court is concerned about reliance on the partisan statements made by defendant's friends and family. The court is also concerned, on the basis of Dr. deLeon's testimony, that he was predisposed to find irregularities that did not exist. For example, Dr. deLeon found it highly unusual that defendant felt that he was the target of a 'federal vendetta' and that he was convicted for doing nothing more than 'talking on the phone' with his friends. To the contrary, not only is this reaction from the defendant unsurprising, it is in fact exactly the theme advanced by his attorneys throughout the pretrial and trial proceedings. What Dr. deLeon mistook for confusion and insensibility was actually the defense urged by defendant's competent criminal defense attorneys under the facts and circumstances of the case.

In sum, in those areas in which the court found Dr. deLeon credible, his testimony is cumulative with the testimony of Dr. Denney.

Accordingly, we shall compare that opinion to the opinion of Dr. Bertschinger.

In comparing the reports and testimony of Drs. Denney and deLeon with that of Dr. Bertschinger, it is necessary, as a preliminary matter, to discuss the different approaches taken by the witnesses. Drs. Denney and deLeon assessed defendant's mental capacity and rendered a judgment as to whether or not the defendant could perform certain tasks up to a minimum level of legal competency. This intellectual process involves three distinct analytical steps: first, determination of the defendant's mental capabilities; second, determination of the legal standard of competency; and third, comparison of defendant's capabilities to the standard. As previously discussed, these witnesses on occasion seemed motivated by the question put by counsel concerning his view of the legal competency standard, thereby reducing the utility of their opinions as their testimony focussed on erroneously premised questions of ultimate fact.

Dr. Bertschinger's testimony was markedly different; he refused to stray beyond his expertise. The doctor explained that it was his understanding that the court, as law finder, would determine what level constituted legal competency and that the court, as fact finder, would compare the defendant's capabilities to the legal standard and make the competency determination. Accordingly, the opinions rendered by Dr. Bertschinger are not tainted by the notions of legal competency conveyed by anyone to the other experts. This fact, in and of itself, makes the testimony of Dr. Bertschinger more credible and useful to the court.

Dr. Bertschinger concurred in the observation of the other two doctors that defendant appeared to suffer from an Alzheimer-type dementia. However, Dr. Bertschinger believes that such a diagnosis is still premature. Alzheimer's Disease is diagnosed pre-mortem through elimination of other possible causes of the observed symptoms. The diagnosis is *only* confirmable post-mortem, through an autopsy. According to Dr. Bertschinger, there is growing evidence that a significant number of people labelled with irreversible

Alzheimer's Disease in fact have treatable depression-induced dementia. Therefore, while Dr. Bertschinger confirmed the general content of the other doctor's observations, he was, based on the record before him, unwilling to commit to a definitive Alzheimer's diagnosis.

In part, the witness's view must be conditioned on his knowledge that the diagnosis of Alzheimer's Disease is often times erroneous. It falls to the court to recognize that though all three capable experts have suggested an Alzheimer's Disease diagnosis in this case, the strong possibility is that the diagnosis is wrong and the proper diagnosis could well be something completely different. No evidence was admitted which tended to show how often a pre-mortem diagnosis of Alzheimer's Disease is proven to be correct after the patient's death.

Ultimately, the specific diagnosis is not determinative of the instant issue because, regardless of whether defendant suffers from Alzheimer's Disease or depression, we are here concerned about his present capacity, due to whatever mental disease or defect.

Dr. Bertschinger did not receive the affidavits which accompanied defendant to Springfield and Dr. deLeon. Dr. Bertschinger also did not see the Presentence Report. Nor did he consult with the attorneys. He did review transcripts of some of the logger tapes shortly before he testified but after he submitted his written report. In short, what he knew about the substantive case against the defendant came from his interview with the defendant and some cryptic remarks in Dr. Denney's report. These circumstances provide an ideal context in which to assess whether defendant understands the case against him and its consequences.

Defendant reportedly told Dr. Bertschinger about the pressure the government put on Robert Biondolillo, arguably the most critical witness to the prosecution. The defendant also discussed specific damaging comments from the interview room tapes, such as when someone said to defendant, "Anthony, you're still the boss." Defendant also remembered the tape in which a visitor mentioned dope and the defendant allegedly jumped up and told him to leave and not come back because

he did not like and did not want to have anything to do with drugs. In protesting that he was innocent, defendant even explained that he could not be guilty because he never had $1,000.00. The latter statement indicates that he retained at least a rudimentary recollection of the $1,000.00 requirement under the Taft–Hartley charges.

Defendant talked about his past, including his 1937 murder conviction, using what Dr. Bertschinger described as self-protective language. For example, defendant recounted that he was not the person who actually pulled the trigger but rather was just an 'aider and abettor' because he drove the car. Defendant also told Dr. Bertschinger that he subsequently received two pardons. (In fact, his sentence was first commuted and then he received a pardon from the governor.) With respect to his previous R.I.C.O. conviction, defendant denied that he was guilty because at the time the crime was committed, he was in Philadelphia.

Defendant was able to recount, with varying degrees of specificity, his past employment. His greatest difficulty came in recounting his experience on the Northeast Ohio Regional Sewer District board. Nonetheless, he remembered that he had been placed on a board by the City of Cleveland as some kind of honor. Given the quantity of records the government has retained on defendant, as well as the public nature of such an act, it would not be difficult for counsel to reconstruct details like this from his past, when his recollections are vague.

Asked about the right of allocution, Dr. Bertschinger indicated that if it meant that defendant had to be an orator, he was probably incompetent but that the defendant would probably be capable of making "a broad statement of the good things he's done."

Dr. Bertschinger readily conceded that the defendant is significantly impaired. However, it is also clear that his medical diagnosis of significant impairment is not equivalent to a legal finding of incompetency. Dr. Bertschinger testified that with patience and diligence, defendant could probably interact with counsel and assist them by providing

information as well as making broad decisions relating to his defense. While the defendant could probably never master the details and subtleties of the Sentencing Guidelines, he is not required to do so.

The questions posed by defense counsel and the arguments contained in his brief tend to understate the question of degree or severity. Mere diagnosis of a mental disease or defect, especially ones like Alzheimer's or depression, does not dictate a finding of incompetency. The diagnosis is the starting point, not the endpoint.

Of the three experts who testified, Dr. Bertschinger demonstrated the most sophisticated appreciation of his role in this context. Additionally, Dr. Bertschinger exhibited the most sophisticated analysis of defendant's condition and its potential cause. Dr. Bertschinger also examined the defendant in the most objective manner. His opinion and testimony appeared least susceptible to influence from the partisan bias of the defendant's friends and family. For these reasons, and in light of the difficulties encountered with the other experts' opinions, this court finds the opinion of Dr. Bertschinger the most credible.

### III

The last evidence which merits discussion is the logger tapes. As *Strickland* counsels, this court should take into account lay testimony corroborating and refuting the expert's opinions. The conversations are mainly between the defendant and his ex-wife and sons. In substance, the conversations are personal. Certain tapes, considered alone and in a light unfavorable to the defendant suggest that he may have been exaggerating his condition to the doctors at Springfield.

Although Dr. Denney concedes this, he testified that the tapes are also susceptible to more innocent explanations. Nonetheless, the doctor testified that the tapes were consistent with his diagnosis to the extent that they displayed the same kinds of fluctuating periods of confusion and lucidity which he observed during his interviews. The tapes are meaningful, therefore, because they afford this court a first hand opportunity to observe the kind of confusion which forms the root of his concern.

Taken as a whole, the tapes support a finding of competency. While the tapes do include periods during which the defendant was apparently confused, assuming that the confusion was caused by his mental condition and not external factors such as his hearing difficulty or the extreme background noise sometimes present[4], the people with whom he spoke were able to work out what he was trying to communicate by asking him questions and giving him prompts. Defendant was not reluctant, in those instances, to tell his family when their questions were misleading. These conversations are consistent with Dr. Bertschinger's testimony that defendant will be able to work with counsel as long as counsel is reasonably patient and diligent.

Some of the conversations also reflect on defendant's perception of the case against him. For example, he talked about the fact that many of the witnesses testified "without backup." In fact, there was very little evidence to support the testimony of individuals like Ron Fino who provided evidence relating to the racketeering enterprise. Defendant also acknowledged the fact that Larry Dean Dusenberry did not testify for defendant at his trial because Dusenberry still had proceedings pending in his own prosecution. Defendant indicated that he and his attorney had discussed the possibility of talking to Dusenberry in light of a recent Sixth Circuit order striking Dusenberry's guilty plea. Defendant said that he gave his attorney permission to contact Dusenberry.

Defendant's conversations also reflect the fact that he realized that a mental impairment could result in his being released. In fact, defendant told his ex-wife that his current attorney said, "You should be sick as hell. Then they can't send you anywhere." The tone of defendant's conversations after he discussed his mental condition with the

---

4. In defendant's very first conversation, and in a subsequent conversation, defendant indicated that he did not have his hearing aid and that his ex-wife would need to bring his spare when he was moved from Springfield back to Ohio. Most of the conversations reflect loud public address announcements and conversations in the background.

doctors at Springfield at which time his memory problem was apparently described to him, indicate a marked improvement in mood. Finally, the defendant frequently reflected that he was sensitive to the fact that his conversations were being monitored by the F.B.I.

The contents of the logger tapes are consistent with a finding that the defendant has sufficient present mental capacity to understand the nature of consequences of his sentencing. The conversations also reflect that defendant understood that if he has a mental defect he can not be sentenced. In addition, the conversations indicate a working memory of his trial and the significance of certain events at the trial. And while this court does not question the experts' belief that defendant has suffered a decrease in his short term memory, the lapses evidenced by the tapes, while occasionally conspicuous, confirm Dr. Bertschinger's belief that they are not of such a degree to render the defendant legally incompetent.

Based on the testimony of Dr. Bertschinger and the logger tapes, this court finds that the defendant understands what is currently at stake. The defendant is capable of providing meaningful assistance to his attorneys to the extent called for at sentencing. Specifically, defendant can assist his attorneys in formulating a response to the historical sections of the Presentence Report. Defendant has self-protective recollection of his past criminal record and the defendant has usable memories of past good things which he has done. Likewise, to the extent necessary for sentencing, defendant certainly has sufficient recollection of the trial and some of the major issues raised therein to provide reasonable, rational assistance to his attorneys with respect to issues like relevant conduct. While the experts agreed that defendant has some impairment of his ability to think abstractly, decisions such as whether to attempt to accept responsibility are not so complex that the impairment described by Dr. Bertschinger and evidenced on the tapes would prevent defendant from reaching an informed, voluntary decision given the assistance of counsel.

Lastly, with respect to exercising his right to allocution, the court is confident that defendant, should he choose to do so, is well able to speak on his own behalf. Both Drs. Bertschinger and deLeon described an individual who continues to subscribe to the belief that he is an innocent man who has tried to do good throughout his life but is thwarted by a government vendetta. The conversations reported by the experts indicate that the defendant remains convinced of his innocence and the value of the things he has done for the community.

The mere fact that the defendant sometimes has to pause to find the correct word or uses words which convey his thoughts though they are not in a technical sense grammatically correct does not render him incompetent. If the defendant would be better served by reading his statement aloud or submitting a written statement to be considered by the court in lieu of, or in addition to, an oral statement, allowances will certainly be made. A defendant's reading of some statement at the time of sentencing is not unusual. Just as this court would not deprive a person who stutters or fears speaking in a public setting the opportunity to communicate on their own behalf, all reasonable accommodations will be made to maximize defendant's opportunity to articulate why this court should be lenient. But the fact that reasonable accommodations may be advisable or that the content of the ultimate statement may not be as moving or articulate as counsel might hope does not render further proceedings constitutionally impermissible.

It is this court's opinion, based on the testimony of Dr. Bertschinger and the content of the tapes, that this defendant is capable of speaking on his own behalf at sentencing.

In conclusion, this court accepts the opinion of the medical experts that defendant can understand the nature and consequences of the proceedings he now faces. This court further finds, consistent with the testimony of Dr. Bertschinger, the logger tapes and the courts own observation of the defendant, that he is capable of rationally assisting counsel for purposes of preparing for his sentencing.

Also, this court finds that defendant has sufficient present mental capacity to exercise his right of allocution and make basic decisions about his defense. Accordingly, defendant's motion is DENIED. The defendant shall be sentenced on March 21, 1994 at 9:00 a.m.

IT IS SO ORDERED.